[Crim. No. 85.   Third Appellate District.—July 19, 1909.]

THE PEOPLE, Respondent, v. MAR GIN SUIE, Appellant.

CRIMINAL LAW—MURDER—SUPPORT OF VERDICT—CONFLICT OF EVIDENCE—IDENTIFICATION OF DEFENDANT.—Upon the trial of the defendant upon a charge of murder, where the evidence leaves no doubt that two Chinese fired shots which resulted in the homicide, and the evidence is conflicting as to the identification of the defendant as being one of the perpetrators thereof, the verdict of guilty of murder is sufficiently supported.

ID.—SUFFICIENT CIRCUMSTANTIAL EVIDENCE.—Where defendant was identified as watching near the scene of the crime, and as running therefrom with a pistol in his hand immediately after the homicide occurred, and disappearing in a cellar, a good case of circumstantial evidence is made out, warranting the jury in considering the defendant as a participant in the crime.

ID.—FLIGHT AS A CIRCUMSTANCE.—If one kills another, though not seen near the scene of the homicide, and flees to some distant locality, the fact that he is found there after the killing might be a mere circumstance tending to establish a consciousness of guilt; but when, as in the present case, the flight of the defendant, carrying a revolver exposed to view, took place from the scene of the homicide immediately following the shots which killed the deceased, it constitutes an incriminating circumstance of the most potent and convincing character, in the absence of any explanation satisfactorily establishing it to be an innocent circumstance.

ID.—PROOF OF CORPUS DELICTI—IDENTITY OF DECEASED—DEATH FROM GUNSHOT WOUNDS.—The *corpus delicti* was sufficiently proved where the body of the deceased was identified as being the person described in the information as having been killed, and that his death was caused by gunshot wounds. The *corpus delicti* may be proved by circumstantial, as well as by direct, evidence.

ID.—PISTOLS FOUND BY ARRESTING OFFICER—CONDUCT OF DEFENDANT—EXHIBITS—EVIDENCE NOT PREJUDICIAL.—It was proper for the prosecution to prove all circumstances connected with the arrest of the defendant, and to show by the arresting officer that he found pistols in the room where he was arrested in Marysville, and the conduct of the defendant in relation thereto, and to admit the pistols as exhibits, notwithstanding they were claimed by another person. In view of the testimony as to the use of a pistol by defendant on the day of the homicide, such evidence was not prejudicial.

ID.—PROOF OF FRUITLESS SEARCH OF DEFENDANT'S PERSON FOR WEAPON —PROPER QUESTION ON CROSS-EXAMINATION—IMMATERIALITY.— Where it was proved that while defendant was in Sacramento the day after the homicide a policeman made a fruitless search of his person for a weapon, it was proper for defendant to ask the policeman on cross-examination whether it was not his object in searching him to find whether he had any weapon upon him; but error in excluding the same was not material or prejudicial.

ID.—ALIBI RELIED UPON BY DEFENDANT—LATITUDE OF EXPLANATION.— When an *alibi* is relied upon by the defendant he should be generally allowed very large latitude in explanation of his conduct in being where he was found, and he has the right to show what effect the conduct of an officer had upon him, consistently with his innocence.

ID.—RULINGS NOT PREJUDICIAL.—*Held,* that no rulings made against the defendant as to the admissibility of evidence were prejudicially erroneous.

ID.—ORDER OF EVIDENCE.—Evidence admitted for the prosecution in rebuttal, which was properly part of the case in chief, and which was material and relevant, would not justify a reversal of the case because admitted out of its regular order.

ID.—TESTIMONY FOR THE DEFENDANT NOT ALLOWED TO BE REPEATED.— Testimony fully given by the defendant in his case in chief was properly disallowed to be merely repeated by him in sur-rebuttal.

ID.—IMPEACHMENT OF WITNESS BY INCONSISTENT STATEMENT—ERROR CURED.—Where the proper foundation had been laid for the impeachment of a witness by an inconsistent statement made by him, error in disallowing the evidence of the impeaching witness on direct examination is cured by the statement of the witness on cross-examination that such inconsistent statement was made. The court could not properly disallow the impeaching witness to prove the inconsistent statement on direct examination merely because the impeached witness had stated that he did not remember the inconsistent statement called to his attention.

ID.—MOTION FOR NEW TRIAL—NEWLY DISCOVERED EVIDENCE—CONFLICTING AFFIDAVITS—DISCRETION.—Where a motion for a new trial was made on the ground of newly discovered evidence, and the affidavits and counter-affidavits were substantially conflicting, the ruling of the trial court in denying the motion on that ground cannot be disturbed by the appellate court, where no abuse of the wide discretion vested in the trial court in passing upon such a motion is made to appear.

ID.—INSTRUCTION AS TO ALIBI.—An instruction on the subject of *alibi*, contended for by the defendant to the effect that such contention, "if established, is a perfect refutation of any crime charged. Such

contention being interposed by the defendant as proof that he is not guilty, it becomes the duty of the jury to pass upon the question as to whether or not said defendant was present at the scene of the homicide at the time of the commission thereof," is proper, and not subject to the criticism that it assumes the commission of the crime.

ID.—INSTRUCTION TO BE CONSTRUED TOGETHER—BURDEN OF PROOF—REASONABLE DOUBT—ESTABLISHMENT OF ALIBI.—The instructions are to be construed together, and where correct instructions were given as to the burden of proof and reasonable doubt, the use of the words "if established" in the instruction as to *alibi*, though not approved of, does not import that defendant must prove the *alibi* by a preponderance of the evidence, but it is only required to be sufficiently shown to raise a reasonable doubt of his guilt. The instruction so construed is harmless, if not correct.

ID.—INSTRUCTION AS TO FLIGHT.—An instruction upon the question of flight, given in general language and stating the law correctly, does not assume the commission of the crime charged against the defendant, nor is it erroneous as declaring that flight, if unexplained by other circumstances, may become a circumstance in the chain of evidence of guilt, depending upon its connection with all the other circumstances shown.

ID.—INACCURATE INSTRUCTION AS TO MURDER OF FIRST DEGREE—REVERSAL NOT REQUIRED UPON EVIDENCE.—An instruction as to murder of the first degree that "it is only necessary that the act be preceded by a concurrence of will, deliberate and premeditated on the part of the slayer, and if such is the case the killing is murder of the first degree," though inaccurate in omitting the words "and the result of" between the word "by" and the words "a concurrence," is not so radically erroneous, in view of the evidence, that it could have misled the jury to defendant's prejudice.

APPEAL from a judgment of the Superior Court of Sacramento County, and from an order denying a new trial. J. W. Hughes, Judge.

The facts are stated in the opinion of the court.

C. T. Jones, and J. E. Alexander, for Appellant.

U. S. Webb, Attorney General, and J. Charles Jones, for Respondent.

HART, J.—The indictment upon which he was tried and convicted charged the defendant with the murder of one Lee

Tong in the city of Sacramento on the twenty-fifth day of April, 1908.

The jury found the defendant guilty of murder of the first degree, fixing the penalty at imprisonment for life (Pen. Code, sec. 190), and the court thereupon rendered judgment in accordance with said verdict.

This appeal is from said judgment and the order refusing the defendant a new trial.

The judgment and order are attacked on the grounds that the evidence does not warrant the verdict, alleged errors in the rulings of the court upon questions of the admissibility of certain evidence and alleged errors in giving and refusing to give to the jury certain instructions.

There appears to be no question but that two Chinamen, each having a revolver, fired upon and shot the deceased, inflicting wounds which produced almost instant death, but there is a sharp conflict in the evidence as to the identity of the defendant as being one of the perpetrators of the homicide. Upon this point, therefore, under the well-known rule as to the conflict of evidence, the verdict is beyond disturbance by a reviewing court.

The contention of the defendant at the trial was that he was not in the city of Sacramento on the day of the homicide, and consequently could have taken no part in the slaying of Lee Tong.

1. The homicide occurred on I street, near the southwest corner of Third and I streets, in said city of Sacramento, at about 8 o'clock P. M., on the day alleged in the indictment.

The facts may be gathered by a reference to some extent to the testimony.

The witness, Gayne, heard the shooting from the corner of Third and I streets, where he was standing at the time; he heard, he said, about five shots. After the first shot he looked in the direction of the point where the shooting was going on and saw two Chinamen engaged in shooting at some-one; that, just after the shooting, he saw the two men who were engaged in it running away, one going across Third street to the east side thereof, carrying a revolver in his hand, and disappearing in a cellar from the sidewalk. He testified that the defendant resembled the man he saw crossing Third

street. Immediately after the shooting this witness went to the spot where Lee Tong fell, and, on examination, found that he was dead, and observed some wounds in his body.

The witnesses, Guernsey and Myers, were near the corner of Third and I streets when the shooting took place. Guernsey testified that he had been sitting upon a railing surrounding the entrance to the basement of a building on Third street, within a few feet of I street, for about ten minutes prior to the shooting; that, a few minutes before the firing began, the defendant came to a point near and just back of him; that defendant walked "up to the corner twice and back." The witness said that he "asked the defendant the time of day"; that he noticed with the defendant another Chinaman, whom he described as "a dark, heavy set Chinaman, very badly pock-marked." The witness further testified that, upon hearing the shots, he left the railing and stepped to the corner, and that just as he reached the corner, the defendant, with a pistol in his hand, ran past him, colliding, in his haste, with the witness Myers, and running "direct across the street to the east side of Third street and disappeared in a cellar." The other Chinaman ran north in the direction of and to the "sand lots." After the arrest of the defendant, a few days subsequent to the killing of Lee Tong, the witness went to the district attorney's office, to which place the defendant and another Chinaman had previously been taken, and there picked out the former as the man, who immediately after the shooting, with a pistol, ran to the east side of Third street and disappeared in a cellar. This witness was positive that the defendant was the man he saw under the circumstances just indicated.

The witness, Myers, who was at Third and I streets when the shooting occurred, corroborated Guernsey on all the important points to which the latter testified. He, too, pointed out the defendant and identified him in the district attorney's office as the man he saw, immediately following the shooting, running, with a pistol in hand, across and to the east side of Third street and descend from the sidewalk into a cellar.

A number of white witnesses—two of them boys, each claiming to be fifteen years of age—testified that they were near the scene of the shooting when it occurred, and saw two

Chinamen running from Third and I streets in different directions as soon as the shooting ceased. They each appeared to be positively of the opinion that the defendant was not one of the fleeing Chinamen.

The witness, Ong Get, said he heard the shooting, and saw and knew the man who ran across Third street and entered a basement and that he was not the defendant, but that "he knew him as Ah Gee Ung."

The defendant, in support of his claim of an *alibi,* testified that he was in San Francisco on the day that the shooting resulting in the death of Lee Tong occurred, and left that city on that evening, about 8 o'clock, on the "Oregon Express," for Marysville, he having received a letter that day from a friend in the last-mentioned place asking him to go there.

The defendant was corroborated on the point of having been in San Francisco and leaving there for Marysville at about 8 o'clock on the evening of April 25th by two other Chinamen.

Briefly, and in a general way, we have thus referred to the principal evidence received at the trial, and it is at once plainly apparent therefrom that, as stated, it is conflicting in a marked degree. Some of the witnesses for the prosecution were shown to have deviated in a slight degree in their testimony at the trial from statements previously made concerning the facts to which they testified; but whatever differences were made to appear between their testimony at the trial and statements made at some other time were for the jury to consider and settle by the aid of legal rules which, obviously, could be of little or no avail to appellate courts, were they at liberty generally to pass upon questions involving the credibility of witnesses, or the weight which should be attached to their testimony. Counsel for the appellant argue, however, that there is no conflict in the evidence, basing such contention on the fact that no witness produced by the prosecution saw or claimed to have seen the shooting, and that all that the people were able to and did prove was the death of Lee Tong from gunshot wounds and the immediate flight of two Chinamen, one carrying a pistol, from the scene of the homicide; that, on the other hand, the testimony for the defense was not only emphatic and direct that the de-

fendant was not one of the fleeing men, but that at the time of the killing he was on his way to Marysville, only a short distance out of San Francisco, and, therefore, could not possibly have been concerned actually in the commission of the crime. But the circumstances established by the prosecution are sufficient, as stated, to sustain the verdict of the jury. It must be remembered that one of the white witnesses testified that he saw the defendant, just prior to the shooting, on Third street, near I street, and that the latter walked to the corner and back several times. This is a circumstance from which the jury were warranted in inferring that the defendant was looking or watching for someone, and adding it to the fact of the killing of Lee Tong by means of pistols, and the circumstance of the flight of the defendant, with a pistol still in his hand, from the scene of the homicide, immediately after it occurred, there is made out what we deem to be a good case of circumstantial evidence. Then there are always certain features developed in the trial of cases which cannot be made to clearly appear in the record on appeal, and by which a jury may properly be more or less influenced in reaching a verdict. In addition to considering the facts and circumstances proved by the people in a criminal case, the jury may, and, presumably, invariably do, consider the nature and character of the defense or the contention which the defendant sets up in opposition to the charge. They may consider whether the witnesses introduced by the defendant to support his defense or contention tell a likely story or relate it in such manner as to entitle it to credence. It is true the burden of proving the guilt of a party charged with crime beyond a reasonable doubt is always upon the people, but the jury, after the cause is submitted to them, are, of course, at liberty to review and consider the whole record, and where circumstances are proven which, with sufficient clearness, show, as is the fact here, that the accused must have been concerned in the actual commission of the crime charged, the rejection of his defense or contention against the charge for the reason that it is, in the judgment of the jury, fabricated or untrue adds just so much more force to the persuasive power of the evidence presented by the people. And the rejection of a defense or contention interposed by one accused of crime is generally for the reason that the *manner*

of the witnesses in giving their testimony in support of such defense or contention is such as to inspire distrust or a. belief that such testimony is not to be credited. Hence, the rule in this state that verdicts or findings cannot be set aside by appellate courts where they rest upon evidence in which there appears to exist or does in fact exist a substantial conflict.

We are not unmindful, in the discussion of this feature of the case, of the rule as to the flight of one accused of crime as laid down in the text-books and decisions. (Roscoe on Criminal Evidence, 18; *People* v. *Stanley,* 47 Cal. 118, [17 Am. Rep. 401]; *People* v. *Wong Ah Ngow,* 54 Cal. 151, [35 Am. Rep. 69].) It is quite true, as these authorities hold, that flight is but a circumstance tending to establish a consciousness of guilt in the person fleeing, but whether it is a strong or a weak circumstance must depend largely upon the circumstances under which the flight is prosecuted and accomplished. If a party kills another and, not having been seen near the scene of the homicide, flees to some distant locality, the fact that he was found in such other place after the killing would perhaps amount to a mere circumstance tending only to prove a consciousness of guilt; but if, after another has been shot and killed in a room or a building by means of a revolver, and immediately after the shots are heard, a party is seen running from such room or building with a revolver in his hand, then the circumstance of flight under those circumstances becomes one of which, considered in connection with the circumstance of the shooting and killing of the deceased, a jury would be justified in predicating a verdict of guilty, in the absence of an explanation satisfactorily showing it to be an innocent circumstance. In other words, the significance of the circumstance of flight, in the extent of its persuasive power, in a case made up entirely of circumstantial evidence, must be determined by the jury in the light of other attending circumstances. In the case at bar, the flight of the defendant from the scene of the homicide, immediately following the firing of the shots and the killing of Lee Tong, carrying, exposed to view, a revolver, constituted an incriminatory circumstance of the most potent significance and importance.

2. The appellant insists that the *corpus delicti* was not established; that the man who was found dead upon the side-

11 Cal. App.—4

walk upon the cessation of the shooting was not shown to be Lee Tong, who is alleged in the indictment as the man murdered by the defendant. There is no merit in this contention.

The witness, Gayne, testified that he witnessed the shooting, saw the deceased immediately after he fell to the sidewalk, and then examined his body sufficiently to find that he was dead. The coroner testified that an autoptical examination of the body of the deceased, made at the inquest, disclosed six gunshot wounds in the body, one of which was on the left side and at the base of the neck; another in the jaw, the bullet passing through the jaw and cutting it in two; one in the right shoulder, one between the fourth and the fifth ribs, one between the ninth and tenth ribs, and another in the left leg, ranging downward. Lee You Ding saw the deceased at the coroner's office and recognized him as Lee Tong, an uncle of the witness. This witness also saw the wound in the jaw of the deceased. The circumstances thus referred to, considered with the other circumstances in the case, amply established the *corpus delicti*. That the testimony proves that the deceased was shot by another person and that he died from the effect of the wounds thus inflicted upon him, and that said wounds were unlawfully inflicted, there is, it seems to us, no room for a reasonable doubt or even cavil. Of course, it will not be denied that the *corpus delicti* may be proved by circumstantial as well as by direct evidence.

3. It is contended by appellant that the court erred to his prejudice in allowing the witness, Lamphrey, the officer who arrested the defendant at Marysville a few days after the homicide, to testify that he found a couple of pistols lying on the bed in the room in which the arrest was made, and in receiving said pistols in evidence as exhibits in the case. It was not clearly shown by the people that these pistols were the property of the defendant. They were claimed by a woman who occupied the room and who testified for the defendant. At the time of the arrest and the finding of the pistols there were another Chinaman and the woman in the room. The claim is that there was no connection disclosed between the weapons and the crime charged, and that, therefore, no testimony should have been received concerning them, nor should they have been exhibited in the case. As a part of the original case of the people, we think the testimony with

regard to the finding of the pistols was proper as furnishing a circumstance bearing upon the charge, whether directly or remotely was for the jury to decide in view of all the other facts and circumstances. Lamphrey said that when he first stepped into the room and looked about he saw the weapons on the bed, and asked to whom they belonged, whereupon the defendant started to walk behind him, when he shoved the Chinaman backward and against the wall and then took possession of the pistols. The woman declared at that time that she was the owner of the pistols, it is true, and in fact claimed ownership of everything in the room; but the people not only had the right to the testimony complained of, but to prove every other circumstance occurring at the time of the arrest of the defendant having any bearing on the crime for which the defendant was arrested or upon his conduct when arrested. His actions when the detective inquired as to the ownership of the pistols were proper to. be described to the jury, and in that connection it was proper enough to receive the testimony relative to the finding of the pistols. In any event, it being undisputed that the deceased was killed by means of a revolver, and the identification of the defendant as one of the parties who left the scene of the homicide with great haste having been sufficiently established, the ruling could not have prejudiced the accused.

It is next urged that the court committed a prejudicially erroneous ruling in refusing to permit the witness, Desmond, to answer the following question propounded by counsel for the defendant on cross-examination: ''Your object in searching him was to find out whether he had any weapons or not upon him, was it not?'' This witness, who is a police officer of Sacramento, had testified on direct examination that he had been detailed to watch the outgoing trains of the Northern Electric Company leaving its depot at Eighth and J streets, in said city, for the purpose of watching for and searching any Chinese who might take any of the cars of said company. On the 27th of April, he testified, he saw the defendant on one of these cars, and searched him. The officer declared that he found no weapons upon him. The question was a proper one on cross-examination, and the court should have allowed an answer thereto. But we cannot see, in view of the witness' direct testimony, how the refusal to allow it could have been

in the least harmful to the accused.  Undoubtedly the point
which it was important that the defendant should desire to
appear clear to the jury was that the officer, having searched
him, found no weapons upon his person, and this does appear
clearly to have been the fact from the officer's direct testi-
mony.    Therefore, whether the officer's *object* in making the
search was to learn whether the defendant had any weapons
upon him at that time became altogether unimportant and
immaterial.

The defendant testified that he came to Sacramento from
Marysville the next day after the homicide for the purpose
of procuring medicine from a Chinese doctor for one Chin
See, a Chinese woman, who was ill.   After his arrival at Sac-
ramento, and while looking for the doctor's office, which was
not located in the Chinese quarters of said city, a policeman
stopped and questioned him as to where he came from, where
he had slept the night before and where he was going.   He
was then asked by his attorney ''what the officer did to him,''
the purpose of the question being to show that the officer
searched him.   Upon objection by the district attorney the
court refused to permit an answer to this question.   Counsel
for defendant declare that the question was proper for the
purpose of showing the effect the conduct of the officer had
upon the defendant.   Where an *alibi* is introduced and relied
upon by a defendant in a criminal case very large latitude is
generally allowed the accused in explanation of conduct which
might otherwise be interpreted as indicating a consciousness
of guilt.   For illustration, where flight is one of the circum-
stances upon which the prosecution rely to establish guilt, the
defendant may testify that certain persons had communicated
to him the fact of the commission of the crime, and had
advised him, for reasons perfectly consistent with his inno-
cence, to keep ''under cover'' or to go to some other locality.
It is a fact within the compass of common knowledge that
when a Chinese visits a city or town, the first place he seeks
is that part of such city or town inhabited by his country-
men.   It, therefore, becomes of peculiar importance to a
Chinese, on trial for the murder of one of his countrymen, to
explain why; if it be a fact, he remained away from ''China-
town'' where and after the homicide was committed, when
seen in the city or town in which it occurred.   And in such

case he should be allowed, as in fact any defendant should, to state any fact which would reasonably tend to explain either flight or why he remained away from those places which, in the very nature of things, under ordinary circumstances, he would be expected first to visit. The question to which objection was sustained by the trial court should have been allowed to be answered; but the ruling could not have operated prejudicially against the accused, in view of the fact that the defendant had just previously stated that, before meeting the policeman, a Chinaman had apprised him of the killing of a "Bing Kong Tong man" on the preceding day by a member of the "Chee Kong Tong," of which the defendant is a member, and that the "Bing Kong Tongs" were "after" all the "Chee Kong Tongs," thus putting the accused on his guard. This testimony was offered and received for the purpose of explaining why the defendant did not visit the Chinese quarters in Sacramento on the day following the homicide, and we cannot perceive how the circumstance of the search of the person of the defendant by the policeman could have added anything to the explanation of his conduct in that respect. The ruling was, therefore, without prejudice.

The defendant having testified that he reached Sacramento from Marysville on Sunday at about the hour of 12 o'clock in the daytime, the people were allowed, in rebuttal of that statement, to prove by a Miss Maybelle Springfield, who was then employed as an operator in the telephone office at Sacramento, that the defendant came into said office between 11 o'clock and 11:30 o'clock in the forenoon of that day and had telephonic communication with someone in Marysville. It is now claimed that this testimony was not in rebuttal of any new material fact brought out by the defense, and that the ruling admitting it involved prejudicial error. Counsel declare that such evidence is immaterial, because it could have no tendency to prove that the defendant was in Sacramento the night before. We do not assent to this contention. It was a circumstance bearing upon the question of the defendant's presence in Sacramento the preceding evening, of more or less importance, according to the weight which the jury, considering it in connection with the other proven circumstances, might feel justified in giving it. The testimony could appropriately have been made a part of the people's original

case, and even if, strictly speaking, it was not proper rebuttal testimony, it being relevant and material, the fact that it was introduced out of the regular order would not justify a reversal of the case. (*People* v. *Arrighini*, 122 Cal. 24, [54 Pac. 591]; *People* v. *Grimes*, 132 Cal. 34, [64 Pac. 101]; *People* v. *Maughs*, 8 Cal. App. 107, [96 Pac. 407].) It is, however, claimed that the fact that the defendant telephoned to someone in Marysville was clearly not rebuttal, nor material for any purpose, and that its admission was injurious to the defendant. If such fact were the only and principal one sought to be proved by the witness, and the circumstance not shown to have had any connection with the crime charged, it would doubtless be an immaterial fact, but we cannot say that even then it would be prejudicial. But the important point which the people designed to bring out through Miss Springfield's testimony was the fact that the defendant was in Sacramento on the day following that upon which Lee Tong was killed at an earlier hour than that at which he claimed to have arrived there from Marysville, and the fact that he communicated with someone at Marysville over the telephone was doubtless referred to by the witness merely as a circumstance explanatory of her recollection of his presence in the telephone office at the time mentioned by her.

The defendant was recalled to the witness-stand after the prosecution had concluded their rebuttal testimony, and asked if he was in the telephone office at the time mentioned and under the circumstances as detailed by Miss Springfield. The court sustained an objection by the district attorney to the question on the ground that it was not sur-rebuttal, and said ruling is assigned as error prejudicial to the defendant. The ruling was not erroneous. When under cross-examination, in the presentation of his original case, the defendant was asked by the district attorney if he was not in the telephone office at Sacramento at the time designated by Miss Springfield and communicated with a party at Marysville, and emphatically declared that he was not in said telephone office at any time in the forenoon of Sunday, the 26th of April, 1908. The defendant was permitted in sur-rebuttal to say that he had never seen the witness, Springfield, until she came into court as a witness, and having already denied, during his cross-examination, that he was in said telephone office on the day

and at the hour mentioned by Miss Springfield, the testimony of the latter brought out nothing new, and, obviously, the answer to the question to which the people's objection was sustained would have amounted only to a repetition of what the defendant had previously testified to.

It was error for the court to decline to permit the witness, Davis, called by the defendant for the purpose of impeaching the testimony of the witness, Myers, to testify to a certain inconsistent statement which it was claimed that the latter had made. Myers, it will be recalled, identified the defendant as the man who, immediately after the shooting, ran from the west to the east side of Third street, disappearing in a cellar. Davis, then a reporter on a Sacramento newspaper, interviewed Myers, shortly after the homicide, with regard to the shooting, and the latter said to Davis: "Now, I don't believe I could identify any of them," referring to the Chinese who ran from the scene of the homicide. The foundation for the impeachment having been properly laid when Myers was under cross-examination, Davis was called as a witness for the defendant and asked if Myers had made the statement referred to. The district attorney's objection to this question was sustained, and we doubt not that the ruling would have been prejudicially erroneous but for the fact that the district attorney himself asked Davis the same question on cross-examination, and the witness replied that Myers did make the statement imputed to him, thereby curing the error involved in the ruling disallowing an answer to the question on the direct examination of the witness. The court's ruling appears to have proceeded on the theory that Myers' reply to the question whether he had made the statement attributed to him did not involve a denial that he made such statement, and that there was, therefore, nothing to contradict. Myers' reply to the question was, "I don't remember." But we think the defendant was entitled as a matter of fairness to have it clearly appear whether the witness did or did not make the inconsistent statement, and that he was not precluded under the rule from showing that the witness did make such inconsistent statement merely because he answered that he did not remember whether he made it or not. (Greenleaf on Evidence, 16th ed., sec. 462.)

4. One of the grounds upon which the motion for a new trial was urged was that of newly discovered evidence, and in support thereof the defendant presented several affidavits. The facts set out in said affidavits were refuted by affidavits filed by the people, and the showing upon that ground involves evidence in which there is a sharp conflict. For this reason the ruling of the trial court thereon cannot be disturbed by this court. A motion for a new trial upon the ground of newly discovered evidence has always been regarded by the courts with a great deal of suspicion and disfavor, for which reason a wide discretion is committed to the trial court in ruling upon the motion when made on that ground. It has been said "that the temptations are so strong to make a favorable showing after a defeat in an angry and bitter controversy, and the circumstance that the testimony had just been discovered when it is too late to introduce it is so suspicious that courts require the very strictest showing of diligence." (*People* v. *Freeman,* 92 Cal. 360, [28 Pac. 261].)

5. The appellant complains of the following instruction, his criticism thereof being that it assumes the proof of the crime charged against him: "It is contended by the defendant here that at the time of the commission of the homicide, he was at a place other than the scene thereof, and, consequently, that it was impossible that he should have committed the same. This particular contention constitutes and is termed in law an *alibi,* and, if established, is a perfect refutation of any crime charged. Such contention being interposed by the defendant as proof that he is not guilty, it then becomes the duty of the jury to pass upon the question as to whether or no said defendant was present at the scene of the homicide at the time of the commission thereof. . . ." The objection to the foregoing instruction for the reason stated is based upon the hypothesis that the word "homicide" is synonymous in meaning with the word "crime," and that, therefore, the court in the instruction necessarily assumed the commission of the crime. The contention is untenable. The killing of a human being by another under any circumstances constitutes a homicide, as an etymological analysis of the word itself will plainly show, but whether a homicide is murder or any other like crime depends, necessarily, on the circumstances under which it is committed. Our Penal Code expressly sets forth the cir-

cumstances and conditions which would make a homicide a murder, and, furthermore, it prescribes the conditions upon which it would be either excusable or justifiable. There could be no such thing as an excusable or justifiable murder, but counsel's argument, carried to its logical end, would inevitably lead to such an absurd result. The authorities cited by counsel on this point need not be specifically noticed, for they do not, of course, uphold their contention. But it is further contended that the instruction is erroneous in that it declared to the jury that an *alibi, "if established,* is a perfect refutation of any crime." The argument is that by the use of the words "if established," the court in effect told the jury that it rested with the defendant to prove that contention by a preponderance of the evidence. We do not think that the instruction, when considered with the several instructions upon the burden of proof and reasonable doubt, should be so construed. The rule is that if the defendant introduces sufficient proof upon the contention of an *alibi* to raise a reasonable doubt as to his guilt, he is entitled to an acquittal, and the court in effect so instructed the jury. The words, "if established," should, therefore, be construed to mean, as it was, manifestly, when read by the light of the other instructions, so intended, that if the proof in favor of the contention of *alibi* was of that degree that it would create a reasonable doubt of the defendant's guilt, then such *alibi* would be "established," and the accused entitled to an acquittal. It is to be assumed that the jury considered the instructions as a whole and understood them, and upon this assumption it must be said that they understood the instruction here complained of as we have construed it. This instruction is very much different in its phraseology from the one condemned in the case of the *People* v. *Roberts,* 122 Cal. 377, [55 Pac. 137]. The instruction in that case treated an *alibi* as a defense and so characterized it, and declared that it was the duty of the defendant to "prove and establish" it to the satisfaction of the jury. Clearly, such an instruction is erroneous, because an *alibi* is not a defense, but an element only of the case which the people must make out before they can demand a conviction. In other words, the prosecution must always prove the presence of the accused at the place where the crime was committed, where it is claimed that he

personally participated in its commission. The characterization of an *alibi* as a defense would of itself be almost sufficient to vitiate the instruction, but the statement therein, in connection with declaring it a defense, that an *alibi* must be "proven and established" to the satisfaction of the jury rendered it a palpably prejudicial misstatement of the law. We do not approve of the statement in the criticised instruction that an *alibi* should be "*established,*" but, as declared, the word as so used should be interpreted and the instruction construed by the light of the other instructions, and as so construed and as undoubtedly it was understood by the jury, it was harmless, if not strictly correct.

The instruction upon flight was given in general language, and stated the law correctly. It does not assume the commission of the crime charged against *the defendant in this case.* Nor is this instruction erroneous because it declares that flight, "if unexplained by other circumstances," *may* become a circumstance in the chain of evidence of guilt, "depending upon its connection with all of the other circumstances shown." This is a clear and correct statement of the law.

It is vigorously insisted that the following portion of the given instruction defining murder of the first degree does not involve a correct statement of the law on that subject, and that the defendant was thereby greatly prejudiced: "It is only necessary that the act of killing be preceded by a concurrence of will, deliberation and premeditation on the part of the slayer; and if such is the case, the killing is murder of the first degree," etc. This instruction, as thus phrased, was criticised by the supreme court in the case of the *People* v. *Maughs,* 149 Cal. 253, [86 Pac. 187], for the reason that there was an omission to insert therein, immediately following the words, "preceded by," the words "and the result of," so that the instruction would have read, "It is only necessary that the act of killing be preceded by *and the result of* a concurrence of the will," etc. But the court in that case does not say that the instruction as given here amounts to such error as to require a reversal, and it is our opinion that it does not. We readily recognize the soundness of the logic at the bottom of the criticism of the instruction in the Maughs case, and must as readily concede that the inclusion of the omitted words referred to would render the description of the

crime of murder of the first degree clearer and more easily understood by jurors; yet, in view of the evidence in this case that the defendant, just prior to the shooting, was seen walking back and forth from a point on Third street to the corner of Third and I, near which Lee Tong was shot and killed, and that two men were engaged in the shooting and that, immediately upon the cessation thereof, they fled with unusual celerity in different directions from the spot at which the homicide took place, thus strongly tending to show that the shooting and the killing, by whomsoever done, was deliberate, premeditated and willful, and no element of self-defense appearing from the proven circumstances, we think the jurors must have understood from the instruction that, if the defendant had deliberately and premeditatedly formed the *will* to slay the deceased, and did thereupon slay him, such slaying must have been the *result* of the *will* or intention so formed, and that, under such circumstances only could they find him guilty of murder of the first degree. It may be remarked that the judgment of reversal in the Maughs case, *supra,* was expressly put upon the ground that the instruction to the effect that it is the duty of a person taking life in self-defense, when attacked, to ''employ all reasonable means within his power, consistent with his safety, to avoid the danger and avert the necessity for the killing,'' was prejudicially erroneous.

Other errors are claimed with reference to instructions given and refused, but they are not of sufficient importance to demand special notice here.

We have extended this opinion to a much greater length than we had intended; but the briefs of the appellant are voluminous, and exhaustively argue from appellant's standpoint every question upon which a reversal of this cause was thought to be justified, and we felt that under such circumstances all the main propositions should be to some extent specially reviewed.

We have examined the record with care, and as a result are convinced that the defendant was fairly tried, the court's charge, as a whole, full, clear and correct, and that the verdict is warranted by the evidence.

For the reasons herein given, the judgment and order appealed from are affirmed.

Chipman, P. J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on September 17, 1909.