**UNITED STATES v. DALHOVER.**
No. 6502.

Circuit Court of Appeals, Seventh Circuit.
April 16, 1938.

Rehearing Denied May 18, 1938.

356

C. B. Tinkham and Timothy P. Galvin, both of Hammond, Ind., for appellant.

James R. Fleming, of Fort Wayne, Ind., Luther M. Swygert, of Hammond, Ind., and Alexander M. Campbell, Asst. U. S. Attys., of Fort Wayne, Ind., for the United States.

Before SPARKS, MAJOR, and TREANOR, Circuit Judges.

SPARKS, Circuit Judge.

The appellant was charged by grand jury indictment, in the District Court for the Northern District of Indiana, with murder, as defined by section 588c of title 12 of the United States Code, 12 U.S.C.A. § 588c.[1] The indictment charged that appellant, on May 25, 1937, at White County, Indiana, within the Hammond Division of said court, did "unlawfully, feloniously, willfully, deliberately, maliciously and with premeditation and malice aforethought kill and murder" Paul Minneman, a human being, with a dangerous and deadly firearm; that the murder was committed by appellant while acting jointly with Alfred J. Brady and Clarence Lee Shaffer, Jr., in avoiding and attempting to avoid apprehension for the commission of the crime of robbery, as defined in paragraph (a) of section 588b of title 12 of the United States Code, 12 U.S. C.A. § 588b (a),[2] of the Goodland State Bank of Goodland, Indiana, an insured bank as defined in section 264 (c) of title 12 of the United States Code, 12 U.S.C.A. § 264 (c).

To this indictment the appellant pleaded guilty, and a jury was impanelled to fix his punishment. Evidence was submitted, and, after argument of counsel and instructions of the court, the jury returned a verdict of death. Judgment was thereupon rendered consistent with the verdict, and from that

[1] Section 588c: "Whoever, in committing any offense defined in section 588b of this title, or in avoiding or attempting to avoid apprehension for the commission of such offense, or in freeing himself or attempting to free himself from arrest or confinement for such offense, kills any person, or forces any person to accompany him without the consent of such person, shall be punished by imprisonment for not less than 10 years, or by death if the verdict of the jury shall so direct."

[2] Section 588b (a): "Whoever, by force and violence, or by putting in fear, feloniously takes, or feloniously attempts to take, from the person or presence of another any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank shall be fined not more than $5,000 or imprisoned not more than twenty years, or both."

judgment this appeal is prosecuted. The errors relied upon arise out of rulings upon the admission of evidence.

On the morning of May 25, 1937, appellant, with Brady and Shaffer, committed an armed robbery of the Goodland State Bank, after it had opened for business, and took therefrom $2,688.88. The bank was an insured bank of the Federal Deposit Insurance Corporation. Appellant and Brady went inside and robbed the bank, while Shaffer, the driver of their automobile, remained at the wheel. In escaping, the bandits, known as the Brady gang, drove east and north from Goodland to a point on state road 16 about two and one-half miles west of Royal Center, where they observed a police car approaching them from the east, in which were Paul Minneman, an Indiana state policeman, and Elmer Craig, a deputy sheriff of Cass County, Indiana. They had heard of the robbery and were engaged in attempting to apprehend the robbers. Upon sighting the officers, the bandits turned their car in the road, began shooting at the officers, and drove rapidly in the direction from which they had come. The officers followed, but on account of the dust and the speed of the fleeing car they lost sight of it.

The bandits drove west about one and one-half miles to the intersection of road 16 with a county road. They stopped their car and got out at the west end of Caley's Church, which is at the northwest corner of the intersection. Brady took a machine gun from their car and laid it down by the southwest corner of the church. Appellant held a thirty-forty Krag rifle, and handed a thirty-o-six rifle to Shaffer. Appellant and Brady waited at the church corner until the police car drove up, when Brady opened fire with the machine gun. As the officers approached the intersection, officer Minneman was driving and had his door partially open looking for a telephone line running into a farm house. They did not know the bandits were behind the church, and as their car slowed up at the corner, the fire from the machine gun raked the officers' car, and Minneman fell out on the ground mortally wounded. A rapid series of shots came from the direction of the church. The police car continued driverless until it struck the church. Before this, however, officer Craig, who had received a bullet wound in his foot, leaped from his car, dropped a shot gun which he had in his hands, and after falling got up and ran to a fence row at the northeast corner of the church. While lying there Brady came to him, covered him with a gun and took his revolver. Craig heard other bursts of gunfire from another point near the church at a time when Brady was not firing.

A farmer who was plowing northwest of the church saw the bandits' car drive up to the west of the church. He testified that three men got out of it and it looked as if all of them had guns. One went behind a tree at the northeast corner of the woodshed which was north of the church; another went to the southwest corner of the church, and "got down" there with something that looked like a gun; the third kept going back and forth behind the church and a little north of the northwest corner. He saw a police car approach, heard the shooting begin, which was an unusual sound for gunfire, in that one "could not distinguish any number of shots at all." Later he saw Craig running north and saw a man at the northeast corner of the church shoot as Craig fell, and bend over him after he had fallen. After hearing the fusillade of shots he heard about four single shots, and one of them came from the northeast corner of the church. He later found a pile of shells at the southwest corner of the church.

Appellant testified that after Brady had finished firing the machine gun, he threw it in their car, grabbed a rifle and ran around the church; that Shaffer and appellant backed their car into the road and drove to where the body of Minneman was lying in the road; that appellant got out of the car and took Minneman's gun from its holster, and that Brady came back from where Craig was lying, picked up the shotgun which Craig had dropped, and took Minneman's belt and holster from his body. Appellant also took a first-aid kit box from the police car, thinking it contained shells. The bandits also had with them a green steel filing case or cabinet which they had taken from the Goodland Bank. After the shooting the three got in their car and escaped to Baltimore, Maryland, where they had been living since November, 1936. Appellant and Shaffer were married to sisters whose near relatives lived in Baltimore.

After the bandits had escaped, Minneman and Craig were taken to a hospital at Logansport, Indiana. Minneman was found to be in a very critical condition. He had a very severe hemorrhage from the wound in his chest. Repeated blood transfusions were given without avail. An emergency operation disclosed that his bowel had been

perforated in two places, the lower portion of his liver was completely shattered, and the lower border of his lung had been shot away. He died of these wounds on May 27, 1937.

Appellant and his accomplices remained in Baltimore until August 7, 1937, when they had an encounter with the police of that city. They shot their way to freedom and escaped, but in doing so they abandoned one of their cars. In this car the police found the revolver taken from officer Craig, and the shotgun picked up by Brady at Caley's Church. In the suit case where these firearms were found they also found another pistol and about three hundred rounds of machine gun and revolver bullets. The belt worn by the deceased was found at the store where the brother-in-law of appellant and Shaffer worked. A gun stock and part of a gun barrel in two burlap bags which also contained several rounds of ammunition, gas bombs, face masks and several chambers of automatic pistols, were also found there. Appellant's brother-in-law testified that appellant and Shaffer, under assumed names, had married his sisters, and that Brady was known to him as Eddie Maxwell, under which name the license of the abandoned car was issued; that after hearing of the bandits' encounter with the Baltimore police, he came into possession of some guns, ammunition and other articles that had been taken to his grandmother's house by his sisters, including the belt and gun handle which had been in appellant's possession. The green steel cabinet taken from the Goodland State Bank, and the first-aid kit taken by appellant from the officers' car at Caley's Church were found at Shaffer's home.

Appellant was captured at Bangor, Maine, on October 12, 1937, where he, Brady, and Shaffer had driven and were attempting to buy additional firearms, including a Thompson sub-machine gun. Appellant, carrying two fully loaded revolvers, had entered the store to make the purchase, and Brady and Shaffer, each carrying two automatic pistols and a revolver, were standing guard on the outside with their automobile parked near by. Officers were stationed inside and outside the building. Appellant surrendered by order of the officers inside the store. Brady and Shaffer began firing at the Government agents, and they were killed by the officers in the street. In their automobile were found two Marlin machine guns, each with three hundred fifty rounds of ammunition, and officer Minneman's handcuffs taken from his car at Caley's Church, together with the stolen license plates used on the bandits' car when the Goodland Bank was robbed.

The Government proved that three fired shells picked up at Caley's Church after the shooting were fired by one of the machine guns found in the bandits' car when appellant was arrested at Bangor. Appellant admitted to a Government agent that the two rifles and one of the machine guns found in their car at Bangor were in their possession at Caley's Church. He further admitted that he assisted Brady and Shaffer in robbing the Goodland Bank, and that he was with them at Caley's Church when officer Minneman was shot. Other officers testified to appellant's admission that he had taken Minneman's gun and belt from his body as it lay in the road after the shooting, and that he might have fired three or four times during the encounter, although he did not remember whether he fired at all.

Appellant further admitted to a Government agent that he, Brady and Shaffer, started their career of robberies in September, 1935; that they robbed approximately one hundred and fifty stores, four jewelry stores, and three banks prior to the robbery of the Goodland Bank; and that in most of them Shaffer was the driver, and appellant and Brady did the robbing. He also admitted that after the trio had started robbing banks, they adopted a policy of voting on the various matters connected with their criminal operations; that prior to October, 1936, Brady had dominated the group, but after he and Shaffer had married sisters, it was possible for appellant to dominate the gang, by influencing Shaffer. Appellant related in detail to a Government agent the manner in which he would rebuild their machine guns, and how they would test them, and practice with them on trees, small stones and rocks.

With relation to the alleged errors assigned, appellant contends that the issue is presented as to "whether the cause submitted to the jury should have been tried under the same rules of evidence as if there had been a plea of not guilty," or under the "theory that the jury stood in the same position as a judge before pronouncing sentence," that is to say, "in the interest of justice to determine the condition or character of the defendant or other pertinent matters before sentence is imposed." Appellant insists that the former procedure

should have been pursued rather than the latter. We think, however, that the former method was pursued by the court in practically every instance. Those instances which seem to have exceeded the limits of such method will be discussed later.

The controversy over the classification of events in this respect lies in the apparent and erroneous assumption, although not expressly stated, that the plea of guilty rendered much of the evidence pertinent to guilt unnecessary and improper on the question of punishment. To accept this assumption would be to depart from the method of procedure upon which appellant's argument is primarily based, that is to say that the trial should have proceeded under the same rules of evidence as if appellant had pleaded not guilty.

 The applicable statute provides a sliding scale of punishment for such crimes. It is obvious that the lawmakers recognized that men, motives and intentions differ widely, and that the circumstances in each case are never the same. It is quite apparent that Congress provided the different degrees of punishment in order to fit the different circumstances in each case, and the different degrees of malice, premeditation, willfullness and deliberateness as established by the evidence. A plea of guilty does not prevent or render unnecessary the proof of all pertinent facts bearing on these matters. We hold that all the pertinent facts and circumstances with respect to the robbery, the shooting at the church, the flight, the pursuit, the attempted capture at Baltimore, the bandits' property there recovered, the arrest of appellant and his associates at Bangor, the killing of Brady and Shaffer, the actions of each of the bandits at Bangor and all the property in their possession, were competent not only to establish guilt if it had been denied, but to be considered by the jury in fixing the punishment. It may be true that this evidence would establish other specific crimes, such as shooting with intent to kill, both at Baltimore and Bangor, yet that would not render the evidence inadmissible, because those crimes could not be considered as unrelated to the murder of Minneman. At Baltimore and Bangor the bandits were merely trying to escape arrest for the robbery and murder, and what they did at that time and what they had with them was clearly admissible not only as bearing upon their guilt of the robbery and the murder, but also in disclosing a lack of contrition, and a continuity of similar and unrelated criminal tendencies which were quite proper for the jury to consider in fixing the penalty.

 It is contended by appellant that the court erred in admitting in evidence the blood-soaked shirt of the deceased, worn by him at the time he was shot. There is no merit in this contention. Johnson v. State, 201 Ind. 264, 167 N.E. 531; McDonel v. State, 90 Ind. 320; Henry v. People, 198 Ill. 162, 65 N.E. 120; State v. Moore, 80 Kan. 232, 102 P. 475.

 Appellant further contends that the court erred in permitting a Government agent to describe the shooting in Bangor between the officers and Brady and Shaffer, and the conduct of each at that time out of the presence of appellant; and to state that he there found three guns on Shaffer. These parties were aiders and abettors, each with the others, in the robbery and murder; the same relationship existed between them in their escape from and their elusion of the officers from the time of the robbery until appellant's arrest. At Bangor, Brady and Shaffer were standing guard, fully armed, to prevent appellant's arrest and to aid in his escape if necessary. Under these circumstances whatever was said or done by Brady and Shaffer while at Bangor, and whatever means either or all of them had in their possession or control to prevent the apprehension, and escape was competent evidence against appellant. There was no error in admitting this evidence.

 Appellant further contends that the court erred in permitting the Government to have brought into the courtroom before the jury, a group of guns, including two large machine guns, seized at Bangor, and in permitting a Government witness to answer in the affirmative as to whether or not the gun resting on the clerk's desk was one of the machine guns found in the automobile which had been occupied by appellant and his two associates at Bangor. There was no error with respect to either of these rulings. Evidence of appellant's flight was admissible against him. Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528. Likewise all facts and circumstances attending his arrest were admissible. Murphy v. United States, 7 Cir., 285 F. 801; Wilson v. United States, 8 Cir., 260 F. 840. This, of course, would include all weapons found in appellant's possession and custody, at and immediately prior to his arrest (see Pedersen v. United States, 2 Cir., 271 F. 187; People v. Morse, 196 N.Y. 306, 89 N.E. 816;

People v. Mar Gin Suie, 11 Cal.App. 42, 103 P. 951), as well as those found in the custody of his abettors and confederates.

■ It is urged by appellant that the court erred in permitting a Government agent to detail to the jury appellant's statement made to him in October, 1937, while under arrest, that appellant, Brady and Shaffer started in their career of holdups approximately in September, 1935; that prior to the Goodland Bank robbery they had jointly committed approximately one hundred fifty grocery store, filling station, and drug store robberies, three bank, and four jewelry store robberies, and had been implicated in two other murders. (The court struck out the last clause with respect to the two murders.) Over appellant's objections and exceptions the witness repeated what appellant had told him with respect to the parts usually performed by each of the bandits in the commission of the crimes referred to. In these rulings there was no error. People v. Popescue, 345 Ill. 142, 177 N.E. 739, 77 A.L.R. 1199.

■ Appellant urges, however, that in the Popescue Case, in which there was a plea of guilty, the evidence was heard and the penalty assessed by a court without a jury. He admits that under such circumstances such evidence is admissible, but not before a jury, because their powers of discrimination and application of evidence are not comparable to those of the judge. We cannot accept this doctrine as to comparable capabilities. Moreover, if it were true, the court at all times stands by, ready to cure such defects, if any, by granting a rehearing, if it thinks there has been a lack of discrimination or a misapplication of the evidence. In support of its contention appellant relies upon Reppin v. People, 95 Colo. 192, 34 P. 2d 71. We are unable to agree with the conclusions therein reached. Of course it is illegal and manifestly unfair to require one charged with a specific crime to prepare a defense against other unrelated crimes that the state may attempt to prove against him, but which are not charged in the indictment. See 10 R.C.L. Evidence, §§ 107-109. However, where, as here, the evidence of other crimes comes only from the lips of the accused in his admissions following his arrest, which he has never denied; and where he has pleaded guilty, so that there is no question as to finding him guilty of the crime charged by the proof of other unrelated crimes, there is no need for the application of the rule. Moreover, it seems to be generally the rule that the court in imposing sentence may take into consideration other offenses committed by the defendant, in the absence of a statute forbidding it. See annotation in 86 A.L.R. 832. There seems to be no good reason for denying the jury the same latitude.

■ Appellant further contends there was error in overruling his objections to the following questions put to him by the Government on cross-examination: "Now, after the Goodland job, did you rob any other banks?" Answer: "Yes." (This was the bank at Thorpe, Wisconsin). Question: "Who was present at the Thorpe Bank robbery?" Answer: "Brady, Shaffer and myself."

These questions were proper as affecting appellant's credibility as a witness. He claimed no constitutional privilege, and there was no error in overruling the objections and permitting the answers.

■ Appellant contends, however, that because of the rulings complained of he was forced to take the stand in his proper defense, when otherwise he would not have done so. This objection is based on the other alleged reversible errors relied upon, which we find do not exist, hence there is no error in this contention.

■ The court, however, permitted certain statements made by the deceased at the hospital, out of the presence of appellant, to be admitted, which we think should not have been received. When Minneman was there assured that it was the "Brady Gang" that robbed the bank, he said: "They sure threw the lead into me. Of course, we officers, we expect that, but never did I think they would shoot me after I was down and kick me." This was merely an indirect recital of a past event, not a part of the res gestae. It was not properly qualified as a dying declaration, and should not have been admitted. However, decedent did not say that appellant either shot or kicked him, and we can not conceive of its admission having any harmful effect upon the verdict. We think the error was harmless.

■ Appellant further contends that the court erred in not instructing the jury as to the applicability of the various classes of evidence admitted, with respect to its bearing upon the degree of punishment. Appellant tendered no instructions nor did he except to any of those given by the court. We find no fault with them.

Judgment affirmed.

MAJOR, Circuit Judge (dissenting).

I do not agree with the conclusion reached. The charge, the applicable statute, as well as the circumstances in connection with the crime, are aptly and fairly set forth.

While the question is not directly raised, it is my judgment that the trial court misconstrued the statute in question. This alone I do not regard as reversible error as such misconstruction did not operate to the injury of appellant, but in view of the fact that it may have some bearing upon what I think is reversible error, I do not deem it amiss to suggest my views in connection therewith. I refer to the form of verdict which was submitted to the jury. Three forms of verdict were submitted by which the jury was authorized to fix a penalty at any number of years, not less than ten, for the period of his natural life, or death. It is my construction of this statute that upon a plea of guilty, no question may properly be submitted to the jury except that of whether the defendant shall suffer the punishment of death. Upon the court is imposed the right and duty to impose a punishment by imprisonment for any term not less than ten years, but if the death penalty is sought that can only be imposed "if the verdict of the jury shall so direct." In other words, the language just quoted is a restriction or limitation upon the right of the court to impose the death penalty, but such limitation or restriction has no application to the imposition of punishment by imprisonment. On a plea of not guilty, in addition to the question of guilt or innocence, there should be submitted to the jury only the further question as to whether or not the death penalty should be imposed. If the jury should answer this question in the negative, it would then become the duty of the court to fix the punishment by imprisonment for not less than ten years. I think this construction is borne out by the legislative history of the statute. The original bill conferred upon the court the duty of imposing punishment without reference to a jury. The bill, as enacted, however, was amended by adding the language "if the verdict of the jury shall so direct." This, in my opinion, could have only had reference to punishment by death and otherwise the statute remained as originally introduced.

As stated in the opinion, appellant contends that the issue presented is "whether the cause submitted to the jury should have been tried under the same rules of evidence as if there had been a plea of not guilty" or under the "theory that the jury stood in the same position as a judge before pronouncing sentence." In my judgment the former theory should have been adhered to. The opinion does not hold to the contrary, but concludes "the former method was pursued by the court in practically every instance. Those instances which seem to have exceeded the limits of such method will be discussed later," and then proceeds to justify what I regard as the most grevious error in the record by the opinion of the court in People v. Popescue, 345 Ill. 142, 177 N.E. 739, 77 A.L.R. 1199, which was a hearing before the court, on a plea of guilty, to determine punishment.

I agree that all pertinent facts and circumstances which bear upon and would be admissible upon a plea of not guilty, should properly be heard by the jury. Conversely, it is my opinion that no evidence should have been admitted in this case which would have been improper had there been a plea of not guilty. Any other conclusion might readily lead to consequences of an absurd nature. For instance, in the case where the person charged with a violation of this statute pleads not guilty, his punishment, if found guilty, is to be determined by one standard, while another person like charged, who pleads guilty, is to have his punishment fixed by another standard. In the former case only that evidence which was material and relevant under the well-established rules of evidence would be heard by the jury, while in the latter case, the jury, in determining whether or not the death penalty should be imposed, is permitted to try and determine that question, not only upon pertinent facts and circumstances, but upon evidence of other crimes unrelated and unconnected with the offense charged. I am unable, by any process of reasoning, to conclude that a person charged with crime, who in court confesses his guilt, should have his punishment determined under circumstances more unfavorable to him than the one who, by denial of his guilt, forces the government to establish the same. Of course, it is said in some cases such a standard would operate to the benefit of the accused, but that is not the situation here, and it does not mitigate the harm done the accused in this case to say that in some other case the accused might be benefited.

I agree with the majority that all testimony concerning appellant's flight, pursuit, including his escapade with the officers in

Baltimore, the arrest of appellant and his associates at Bangor, Me., the property in their possession at that time, the blood-soaked shirt of the deceased worn at the time he was shot, and the exhibit of firearms with which appellant had been connected, was properly admissible.

I cannot agree, however, to the relevancy of the testimony of the government agent that the appellant, after his arrest, confessed that prior to the crime charged he and his associates committed approximately 150 grocery store, filling station, and drug store robberies, three bank and four jewelry store robberies, and had been implicated in two other murders. True, the court sustained an objection with respect to the two murders, but not upon the ground that it was immaterial or improper, but for the reason it was not responsive to the question propounded. Without doubt, such evidence under a plea of not guilty would have constituted reversible error. As the court said in People v. Lane, 300 Ill. 422, on page 424, 133 N.E. 267, 268:

"The defendant had a right not only that his guilt or innocence should be determined without the introduction of irrelevant evidence of other crimes which it could be shown he had committed, but also to have his punishment, if he were found guilty, fixed with reference only to the circumstances of the crime of which he was convicted, and not upon the consideration, also, of other serious and inexcusable crimes which he had confessed."

Again the same court in People v. Heffernan, 312 Ill. 66, on page 72, 143 N.E. 411, 414, makes this very pertinent statement:

"The defendants in this case were practically tried, not only for the crime of murder as charged in the indictment, but also for the other five robberies admitted in evidence, proof of which was not competent under any legal theory of the case. It is therefore not possible for this court to say that they were not greatly prejudiced by the admission of the evidence aforesaid. We have positively held that a verdict finding a defendant guilty of murder and fixing his punishment at death cannot be sustained, even though there is competent evidence in the record to support it, where incompetent evidence has been admitted which shows the commission of other crimes by the defendant and that have a tendency to influence the jury in fixing the degree of punishment. People v. Lane, 300 Ill. 422, 133 N.E. 267."

Many authorities could be cited to the same effect. In fact, it is a well-nigh universal rule. One more, however, is sufficient. In Boyd v. United States, 142 U.S. 450, on page 458, 12 S.Ct. 292, 295, 35 L.Ed. 1077, wherein the defendant was charged with murder and where the trial court allowed proof of other offenses unrelated to the inquiry as to the murder charge, the court said:

"Proof of them only tended to prejudice the defendants with the jurors, to draw their minds away from the real issue, and to produce the impression that they were wretches whose lives were of no value to the community, and who were not entitled to the full benefit of the rules prescribed by law for the trial of human beings charged with crime involving the punishment of death. Upon a careful scrutiny of the record we are constrained to hold that, in at least the particulars to which we have adverted, those rules were not observed at the trial below. However depraved in character, and however full of crime their past lives may have been, the defendants were entitled to be tried upon competent evidence, and only for the offense charged."

The majority opinion, in sustaining the admission of this testimony with reference to offenses other than that charged, relies entirely, so far as authorities are concerned, upon the case of People v. Popescue, supra. A reading of that opinion, however, in my judgment, affords scant, if any authority for such conclusion. It is true, in that case, on a plea of guilty, the court, in determining the punishment, heard the written confession of the defendant as to the commission of another murder about three hours before the one charged. In the hearing the defendant claimed the killing was accidental and, of course, proof of the other murder, committed under similar circumstances, was heard as bearing upon the question of intent. It was an exception to the general rule and perhaps would have been admissible even in a trial before a jury. Also, in that case the court was conducting a hearing after a plea of guilty, as is provided by section 4 of division 13 of the Criminal Code of Illinois, Ill.Rev.Stat.1937, c. 38, § 732, making it the duty of the court to examine witnesses as to the aggravation and mitigation of the offense. The court holds that this provision is mandatory under such circumstances and the court is required to make such examination upon the request of either the people or the defendant. Such proceeding is held

not to be a trial, citing many authorities in support thereof. The court emphasizes the fact that the proceeding was a hearing before the court without a jury and compares the same to that in chancery cases where the court is presumed to disregard all evidence except that which is competent and relevant to the issue. How can it be said that the situation there discussed has any relevancy to that here presented? This is not a hearing before a court as in chancery, but is a trial by a jury upon an issue as to whether or not the death penalty shall be imposed. The mere fact that only one issue is submitted to the jury under a plea of guilty rather than two issues upon a plea of not guilty, does not detract from or mitigate against such position. Even if it be conceded that the trial judge has the right to hear evidence of other crimes where the discretion of fixing the punishment is vested in the court, it does not follow by any means that such evidence may properly be heard by a jury. Especially must this be true where it is apparent that Congress, in enacting the statute, deliberately took from the court the right to impose the death penalty until that question had been affirmatively determined by a jury. Undoubtedly, the jury which the statute refers to must be selected and impaneled in the same manner as the jury in any other case and be amenable to all restrictions with which the law surrounds a jury, both for its protection and that of the parties to the issues submitted. The mere fact that only one question is required to be submitted, under the circumstances here existing, does not make it any less a trial by jury, and the same procedure should be followed, including the admission of testimony as would be applicable and pertinent to any other issue submitted for jury trial. This position is sustained by the Supreme Court of Colorado in Reppin v. People, 95 Colo. 192, 34 P.2d 71, wherein the defendant entered a plea of guilty to a charge of murder and under a statute which provided for the submission to a jury of the question of the penalty to be imposed.

I agree with the majority that the statements made by the deceased prior to his death should not have been admitted. I think, however, it was a prejudicial statement, perhaps not sufficient in itself to require a reversal, but when considered in connection with other incompetent testimony to which I have referred, requires a reversal of this judgment.

That this record discloses a crime brutal in the extreme is obvious, which it is not difficult to believe justifies the extreme penalty. Notwithstanding this situation, however, appellant was entitled to have the only issue submitted to the jury determined upon competent evidence and to have the penalty determined for the offense charged.