(No. 53414.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. ANDRE JONES, Appellant.

*Opinion filed December 17, 1982.—Rehearing
denied April 8, 1983.*

SIMON, J., concurring in part and dissenting in part.

David C. Hoffman, of Belleville, for appellant.

Tyrone C. Fahner, Attorney General, of Springfield (Melbourne A. Noel, Jr., and Michael Vujovich, Assistant Attorneys General, of counsel), for the People.

JUSTICE GOLDENHERSH delivered the opinion of the court:

Defendant, Andre Jones, was indicted with a codefendant, Freddie C. Tiller, Jr., in the circuit court of St. Clair County for three counts of murder (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(1)), three counts of armed violence (Ill. Rev. Stat. 1979, ch. 38, par. 33A—2) and three counts of armed robbery (Ill. Rev. Stat. 1979, ch. 38, par. 18—2(a)). The St. Clair County public defender was appointed to represent him, but upon allowance of the public defender's motion to withdraw other counsel was appointed. Defendant entered a plea of not guilty which was subsequently withdrawn, and he pleaded guilty to the three murder charges. Pursuant to section 9—1(d) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(d)) the People requested a separate sentencing hearing and defendant elected to have a jury impaneled for those proceedings. The jury found, unanimously, that one or more of the factors set forth in the statute existed and, following the consideration of aggravating and mitigating factors, found unanimously that there were no mitigating factors sufficient to preclude a sentence of death. (See Ill. Rev. Stat. 1979, ch. 38, par. 9—1(g).) The jury returned a verdict directing the court to sentence defendant to death, and defendant was sentenced to

death for each of the three murders. The sentences were stayed (73 Ill. 2d R. 609(a)) pending direct appeal to this court (Ill. Const. 1970, art. VI, sec. 4(b); 73 Ill. 2d R. 603).

The testimony and defendant's confession showed that on the morning of April 30, 1979, defendant left his apartment carrying a .22-caliber Rohm revolver. Defendant and his girlfriend walked until they met with Tiller. The three of them walked until they saw an elderly man, Richard Stoltz, standing in the back of a pickup truck, stacking bricks. Tiller, stating that he was going to rob Stoltz, asked defendant for his gun. Defendant gave his gun to Tiller, who told Stoltz, "This is a stickup." Stoltz raised his hands, and Tiller fired the gun, striking Stoltz in the left eye. Tiller then took a wallet, keys and a wrist watch from Stoltz' body. Defendant and Tiller rejoined the girlfriend, who had crossed the street. They continued their walk until they arrived at the Illinois Cleaners, located across the street from Jones' apartment. The girlfriend left after being told by defendant to go home. Defendant then suggested that he and Tiller rob the cleaners, and Tiller agreed. Defendant and Tiller entered the store and, once inside, defendant shot the proprietor, Samuel Nersesian, in the head. He fell to the floor, and defendant shot him again. Defendant then opened the cash register and took an undetermined amount of money. As they were about to leave, a mail carrier, Debra Brown, who had arrived in a mail truck, entered the store. Defendant hid behind the door, and when Miss Brown entered, defendant grabbed her around the neck from behind. He pushed her back through a kitchen located at the rear of the business and into a storage room. There defendant knocked her down, shot her in the chest, and then shot her in the mouth. Defendant and Tiller then left the store. Tiller left the scene in the mail truck, and defendant walked across the

street to his apartment. All three of the shooting victims died.

Following the introduction of the foregoing evidence and the giving of instructions to the jury, the jury returned a verdict finding that defendant had been convicted of murdering two or more individuals and that at the time of the offenses he had attained the age of 18 or more. (See Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(3).) The cause then proceeded to the aggravation and mitigation phase.

The evidence showed that defendant had a significant history of criminal activity. Included therein was defendant's confession to two murders committed prior to the offenses for which he was being sentenced. No information in mitigation was offered by either defendant or the People. After deliberating for approximately 20 minutes, the jury returned a verdict unanimously finding that there were no sufficiently mitigating factors present to preclude imposition of the death sentence. Pursuant to the verdict and statute (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(g)), the court sentenced defendant to death for the murders of Richard Stoltz, Samuel Nersesian and Debra Brown.

We consider first defendant's contention that the death penalty provisions of the statute are unconstitutional for the reason that they do not contain sufficient guidelines to enable a jury to properly determine when the death penalty may be imposed. Defendant cites first the language of section 9—1(g) which in pertinent part provides:

"If there is a unanimous finding by the jury that one or more of the factors set forth in Subsection (b) exist, the jury shall consider aggravating and mitigating factors as instructed by the court and shall determine whether the sentence of death shall be imposed. If the jury determines unanimously that there are no mitigating factors sufficient to preclude the imposition of the death sen-

tence, the court shall sentence the defendant to death."
(Ill. Rev. Stat. 1979, ch. 38, par. 9—1(g).)

Citing definitions of "preclude" (Webster's Seventh New
Collegiate Dictionary (1963); Random House Dictionary of
the English Language (1973)) defendant argues that the
statutory provision which requires the jury to impose death
if it "unanimously finds that there are no mitigating fac-
tors sufficient to preclude the imposition of the death sen-
tence *** must necessarily impose the capricious and arbi-
trary sentencing it seeks to avoid." He argues further that
under a literal interpretation of the statute a jury "would
be required to impose death unless defendant presented a
complete defense to the aggravating factors qualifying him
for the death penalty." The alternative to the literal inter-
pretation, he contends, is that there are no standards or
guidelines, and the weighing procedure mandated by our
earlier cases is nullified.

We do not agree. In *People v. Brownell* (1980), 79 Ill.
2d 508, the defendant contended that the trier of fact was
not given guidance as to the weight to be given the aggra-
vating versus the mitigating factors and that section 9—
1(g) was therefore unconstitutionally vague. In rejecting
this contention the court said:

> "Without doubt, a balancing process is required; while
> the precise weight to be given each aggravating and miti-
> gating factor is not made a matter of numerical calcula-
> tion, that is not a constitutional infirmity. Rather, since
> the sentencing authority is given specific evidence to
> weigh, based upon the particularized circumstances of the
> case, any ' "discretion to be exercised is controlled by
> clear and objective standards so as to produce non-dis-
> criminatory application." ' *Gregg v. Georgia* (1976), 428
> U.S. 153, 198, 49 L. Ed. 2d 859, 888, 96 S. Ct. 2909,
> 2936, quoting *Coley v. State* (1974), 231 Ga. 829, 834, 204
> S.E.2d 612, 615. As stated in *Proffitt*: 'While the various
> factors to be considered by the sentencing authorities do
> not have numerical weights assigned to them, the re-
> quirements of *Furman* [*Furman v. Georgia* (1972), 408

U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726] are satisfied when the sentencing authority's discretion is guided and channeled by requiring examination of specific factors that argue in favor of or against imposition of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition.' *Proffitt v. Florida* (1976), 428 U.S. 242, 258, 49 L. Ed. 2d 913, 926, 96 S. Ct. 2960, 2969." (79 Ill. 2d 508, 534.)

It is clear from the foregoing statement that preclusion of the death penalty does not require, as defendant contends, "a complete defense to the aggravating factors qualifying him for the death penalty." Furthermore, we find that section 9—1(g), as construed, fulfills the constitutional requirement that the sentencing authority be given specific factors to examine in determining whether to impose the death penalty.

We consider next defendant's contention that section 9—1(e) is invalid for failing to set any standard save relevance for the admission of information in the second phase of the sentencing hearing. Section 9—1(e) provides:

"(e) Evidence and Argument. During the proceeding any information relevant to any of the factors set forth in Subsection (b) may be presented by either the State or the defendant under the rules governing the admission of evidence at criminal trials. Any information relevant to any additional aggravating factors or any mitigating factors indicated in Subsection (c) may be presented by the State or defendant regardless of its admissibility under the rules governing the admission of evidence at criminal trials. The State and the defendant shall be given fair opportunity to rebut any information received at the hearing." (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(e).)

It is argued that since the People are permitted to present any "information" relevant to other aggravating and mitigating factors regardless of its admissibility under the rules of evidence, the only restraint placed upon the State's Attorney's discretion is his personal sense of propriety. It is also argued that this provision penalizes a

defendant for electing to be sentenced by a jury rather than a judge, who, when considering the information presented, would be possessed of knowledge of the rules of evidence. Finally, specific alleged examples are cited where it is claimed that defendant was prejudiced by reason of the jury's consideration of certain information.

The purpose of the aggravation and mitigation phase of the sentencing hearing is to insure that discretion in the area of sentencing be exercised in an informed manner. In *Woodson v. North Carolina* (1976), 428 U.S. 280, 49 L. Ed. 2d 944, 96 S. Ct. 2978, the Supreme Court said:

"This Court has previously recognized that '[f]or the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender.' *Pennsylvania ex rel. Sullivan v. Ashe* [(1937), 302 U.S. 51, 55, 82 L. Ed. 43, 46, 58 S. Ct. 59, 61]. Consideration of both the offender and the offense in order to arrive at a just and appropriate sentence has been viewed as a progressive and humanizing development. See *Williams v. New York* [(1949), 337 U.S. 241, 247-49, 93 L. Ed. 1337, 1342-43, 69 S. Ct. 1079, 1083-84]; *Furman v. Georgia* [(1972), 408 U.S. 238, 402-03, 33 L. Ed. 2d 346, 443-44, 92 S. Ct. 2726, 2810-11] (Burger, C.J., dissenting). While the prevailing practice of individualizing sentencing determinations generally reflects simply enlightened policy rather than a constitutional imperative, we believe that in capital cases the fundamental respect for humanity underlying the Eighth Amendment, see *Trop v. Dulles* [(1958), 356 U.S. 86, 100, 2 L. Ed. 2d 630, 642, 78 S. Ct. 590, 597] (plurality opinion), requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." 428 U.S. 280, 304, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991.

In *People v. La Pointe* (1981), 88 Ill. 2d 482, 496, we

quoted with approval from *People v. Adkins* (1968), 41 Ill. 2d 297:

" '[A] sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law.' (41 Ill. 2d 297, 300.) While 'the judge *** is not limited to considering only information which would be admissible under the adversary circumstances of a trial,' he must 'exercise care to insure the accuracy of information considered.' 41 Ill. 2d 297, 300."

While in *La Pointe* and the authorities therein discussed the court was the "sentencing body," there is no valid reason to apply a different rule where the jury makes the determination. The court and the People are under a duty to avoid the introduction of evidence, the prejudicial effect of which outweighs its relevance. (See *People v. Riley* (1941), 376 Ill. 364, 369.) Section 9—1(e) also provides that both the People and the defendant "shall be given fair opportunity to rebut any information received at the hearing." The requirement that the information be relevant, construed in the light of these basic rules, imposes sufficient restraints on the exercise of the prosecutor's discretion and serves to minimize the risk of arbitrary and capricious action. Our holding that in imposing sentence a jury is entitled to the same latitude in considering information relevant to sentencing as is the court is in accord with those of most of the jurisdictions which have considered the question. See cases collected at Annot., 96 A.L.R.2d secs. 13 through 16, at 768, 811 (1964); 96 A.L.R.2d secs. 13 through 16, at 333, 339 (Later Case Serv. 1976); 96 A.L.R.2d Supp. secs. 13 through 16, at 153, 169 (Later Case Serv. 1981).

In considering many of defendant's contentions we note that it is well settled that a defendant in a capital case has no due process right to cross-examine all out-of-court sources of information relied upon in sentencing. (*Williams v. New York* (1949), 337 U.S. 241, 250-51, 93 L. Ed. 1337,

1343-44, 69 S. Ct. 1079, 1085.) Defendant contends that the revolver used in the April 30 shootings was improperly offered for the jury's consideration because its admission was based on hearsay testimony. During the aggravation and mitigation phase of the hearing an East St. Louis detective testified on direct examination that a certain .22-caliber Rohm revolver was the weapon used in the April 30 shootings. The detective testified that he obtained this information from a sergeant on the East St. Louis police department who had received the information concerning the weapon from defendant and had then obtained the weapon from the home of the defendant's grandmother. The detective also testified that the weapon was tested for ballistics with slugs removed from the bodies of the victims. At this point defense counsel objected, and his objection was overruled. Defense counsel then asked that the record show continuing objection, and the court so ordered. The detective then testified that the ballistics tests from the crime laboratory were "positive," indicating that the revolver was the weapon used in the April 30 shootings. In view of the fact that defendant confessed to using a .22-caliber Rohm revolver in the shootings, we hold that the weapon was not improperly introduced into evidence.

Next, we consider whether information concerning defendant's past misconduct contained in a presentence investigation report was properly introduced at the sentencing hearing. A St. Clair County probation department investigator who had prepared a presentence report of defendant's character and background testified that according to records of the Juvenile Department of Corrections defendant had been involved in theft while incarcerated in a juvenile detention institution. The investigator further testified that according to information obtained from the parole board defendant had been involved in 22 disciplinary violations while incarcerated in the Menard Correctional Center. The investigator also quoted from a psychiatric re-

port contained in an evaluation of defendant given to the parole board. The report stated that defendant "has aggressive tendencies, low frustration tolerance, high impulsivity, very poor delaying mechanism, and total inability to channel his aggression into constructive aspects of life."

In cross-examining the investigator defense counsel elicited other general information obtained from records concerning defendant. Apparently preparing the groundwork for his closing argument, defense counsel reviewed some of the information the parole board had before it when it released defendant. In closing argument defense counsel asked the jury to channel their desire to place blame on the parole board that released the defendant into a society where he did not belong. Had defense counsel's strategy succeeded it is doubtful that it would now be argued that it was unfair to permit proof by means of hearsay testimony of the information contained in the reports. In addition, we note that defense counsel asked the investigator whether it was not true that after talking with defendant and completing his investigations that it was found that much of the information provided by defendant was true, and the investigator agreed. Past criminal involvements disclosed by presentence investigation reports have been held a proper matter for consideration in sentencing (see *Williams v. New York* (1949), 337 U.S. 241, 250-51, 93 L. Ed. 1337, 1343-44, 69 S. Ct. 1079, 1085; see cases collected at Annot., 96 A.L.R.2d sec. 10(h), at 768, 804 (1964); 96 A.L.R.2d sec. 10(h), at 333, 339 (Later Case Serv. 1976); 96 A.L.R.2d sec. 10(h), at 153, 167 (Later Case Serv. 1981), and we hold that the inquiry here into defendant's background was within reasonable bounds.

We next consider whether the information contained in the defendant's confession to the other murders, committed prior to the April 30 murders, was improperly admitted at the aggravation and mitigation phase of the sentencing hearing. The record shows that on August 30,, 1979, a

detective from the St. Clair County sheriff's office interviewed Tiller at the St. Clair County jail to determine whether Tiller had any knowledge of other unsolved crimes in the St. Clair County area. Tiller told the detective that defendant might have been involved in some of those crimes. The detective then interviewed defendant at the St. Clair County jail. After being advised of his constitutional rights, defendant expressed general knowledge of other homicides in the St. Clair County area without providing any specific information. Two days later, on September 1, 1979, defendant asked to see the detective. When the detective met defendant at the jail he was given a six-page statement, handwritten by defendant, confessing to the homicides of Michael and Dora Wallace. Having no knowledge of these homicides, the detective did not question defendant about his confession at that time. After having obtained information regarding the homicides the detective again met with defendant at the St. Clair County jail. As a result of this interview, information was gathered that corroborated the confession. In addition, defendant also arranged to have an unidentified female deliver to the detective the butcher knife used in the killings. The knife was subsequently identified as a butcher knife belonging to one of the victims.

The first question presented is whether this information was obtained in violation of the defendant's right to counsel. There is no question that under the sixth and fourteenth amendments a defendant is entitled to advice of counsel at the sentencing stage of the criminal process unless he has knowingly and intelligently waived this right. (*Mempa v. Rhay* (1967), 389 U.S. 128, 19 L. Ed. 2d 336, 88 S. Ct. 254; *Carter v. Illinois* (1946), 329 U.S. 173, 91 L. Ed. 172, 67 S. Ct. 216; *Johnson v. Zerbst* (1938), 304 U.S. 458, 82 L. Ed. 1461, 58 S. Ct. 1019.) The record here reflects that the detective from the St. Clair County sheriff's office interviewed defendant at the St. Clair County jail

where defendant was incarcerated after being charged with the April 30 murders. The purpose of this initial interview was to obtain any information defendant might have about other homicides in the East St. Louis area. Although counsel had been appointed for defendant, this initial interview was conducted, and subsequently a confession was obtained, without the presence of or notice to defendant's attorney. The record shows, however, that at the time of the initial interview defendant was advised of his constitutional right to counsel and that he signed a waiver form. At this first interview he gave no specific information but told the detective that the reason he had been caught for the crimes he had committed in the past was that he had been identified by the victim or witness. He stated that the last time he was in the penitentiary he had made up his mind that he would never be identified by a witness or victim again because he would destroy them. It was defendant who initiated the subsequent contact with the detective, at which time defendant gave the officer his six-page handwritten confession of the Wallace killings. The record does not show how many more times the detective talked to defendant or whether defendant was again advised of his rights at the subsequent interviews. At those times he corroborated his confession by informing the detective that there had been a small brown dog at the Wallace home, where the killings occurred, by describing the knives and small caliber pistol that had been at the home, and by arranging to have the knife he said he used in the killings, later identified as the victim's knife, delivered to the county jail. Nevertheless, we find no violation of defendant's constitutional right to counsel. It is clear that defendant was no stranger to criminal proceedings and there is no claim that defendant was not aware of his right to confer with his attorney prior to giving any information to the detective. The voluntariness of defendant's participation in the interviews conducted at the St. Clair County jail is not

contested. Defendant apparently voluntarily and knowingly waived his right to have counsel present at these interviews, and therefore the information obtained pursuant to these interviews cannot be suppressed on the ground that defendant's sixth amendment right to counsel was violated.

We next consider whether the offenses shown by defendant's confession were properly admitted into evidence. In *United States v. Dalhover* (7th Cir. 1938), 96 F.2d 355, the court considered whether it was permissible for a jury to consider a defendant's statement to a government agent, made while under arrest, in which the defendant's participation in approximately 150 robberies was admitted. In rejecting the contentions that it would be unfair to allow in this information of other offenses and that a jury lacked the discrimination capable of a judge in considering the information, the court said:

> "Of course it is illegal and manifestly unfair to require one charged with a specific crime to prepare a defense against other unrelated crimes that the state may attempt to prove against him, but which are not charged in the indictment. \*\*\* However, where, as here, the evidence of other crimes comes only from the lips of the accused in his admissions following his arrest, which he has never denied; and where he has pleaded guilty, so that there is no question as to finding him guilty of the crime charged by the proof of other unrelated crimes, there is no need for the application of the rule. Moreover, it seems to be generally the rule that the court in imposing sentence may take into consideration other offenses committed by the defendant, in the absence of a statute forbidding it. See annotation in 86 A.L.R. 832. There seems to be no good reason for denying the jury the same latitude." (*United States v. Dalhover* (7th Cir. 1938), 96 F.2d 355, 360.)

(See cases collected at Annot., 96 A.L.R.2d sec. 13, at 768, 811-12 (1964); 96 A.L.R.2d sec. 13, at 333, 339-40 (Later Case Serv. 1976); 96 A.L.R.2d sec. 13, at 153, 169-70 (Later Case Serv. 1981).) In view of defendant's conviction

on pleas of guilty, his voluntary confession, and the substantial corroboration present, we find no reason to conclude that the defendant's confession to the Wallace murders was improperly presented at the sentencing hearing.

We consider next the specific allegations of prosecutorial abuse as to the information presented. The record shows that Dora and Michael Wallace were found dead in their burning home in East St. Louis on November 15, 1978. It was established that Mrs. Wallace suffered deep lacerations to the throat area and bludgeoning of the face and head area, as well as deep gashes in the hands and arms. Mr. Wallace had been decapitated. Defendant's confession, which was read to the jury, contained the details of defendant's commission of the acts that resulted in the deaths of the Wallaces and the burning of their home. Defendant also confessed to taking Mr. Wallace's head with him and later discarding it in the area where the skull was subsequently found. A detective from the East St. Louis police department was asked on direct examination to relate to the jurors the circumstances as he confronted them when he arrived at the scene of the Wallace case on November 15, 1978. The following colloquy then took place:

"A. Well, the first thing I saw was a fireman running down the street, screaming. And it was about two or three firemen standing on the porch. And I approached the porch, and there was blood running down off the front porch, because it was raining, and I saw a body of a man who was—who had been beheaded, and was burning on one side. He had on some shorts, undershorts, and a white T-shirt that was soaked in blood.

Q. He was not fully dressed when you arrived there?

A. No.

Q. Did anyone indicate to you or did you learn whether or not that was the way he was when he was first seen by the fireman?

A. Well, the fireman explained to me they had entered the building or the smoke filled room, and had stumbled upon this body. And they had pulled it out onto

the porch in an effort to give the person artificial respiration, and the fireman who was running down the street was the guy who was going to give artificial respiration, and there wasn't a head.

Q. So it was originally inside the house, the body?

A. Yes."

The description of the fireman's reaction was elicited in response to general questions posed by the State's Attorney on direct examination. The gruesome description contained in the detective's testimony was unnecessary to describing the circumstances of the scene, but we are not prepared to conclude that it was so totally unrelated to sentencing and prejudically inflammatory as to deny the defendant a fair hearing. While we acknowledge that the description of the fireman's reaction was bound to cause emotional response, we note that the jurors heard defendant's own grim and detailed description of the Wallace killings and the burning of their home. The jurors received this information after hearing defendant's confession to the murders of three people. In view of the aggravating factors present, and the complete absence of any mitigating circumstances, we cannot conclude that the jury was so inflamed by receiving the challenged information that it was unable to base its decision that there were no mitigating factors sufficient to preclude the death penalty on information properly presented.

At the first phase of the sentencing hearing the widow of Richard Stoltz was asked to identify a photograph of her husband, taken after he had been shot. At the conclusion of the second phase this photograph, along with several other photos depicting the victims of both the April 30 and the Wallace killings and the burned Wallace home, was presented to the jury as information relevant to an aggravating factor, specifically, to show the type of brutality in which defendant had engaged. It is unlikely that at this point in the proceedings the photographs would have created more revulsion in the jurors toward defendant than

was already present. Since the jury deliberation took approximately 20 minutes it is clear that there was little difficulty in deciding that the death penalty was warranted, and we do not believe that the admission of these photographs at this late date in the proceedings deprived defendant of the right to be sentenced by a rational tribunal.

We consider next whether the court's conduct during the sentencing proceedings violated defendant's fundamental right to a fair hearing as guaranteed by the due process clause of the fourteenth amendment. Foremost among the errors alleged is the claim that the court erred in allowing defendant's plea of guilty to be read to the jury. It is argued that the reading of the transcript denied defendant a fair trial because the court's comments contained therein implied the court's predisposition as to the sentence to be imposed, which in turn improperly influenced the jury in arriving at the verdict. The transcript of the plea proceeding was read to the jury during the first phase of the bifurcated hearing to establish defendant's age and the presence of a statutory factor in aggravation. Included in the reading were the court's admonishments to defendant that if statutory factors in aggravation were proved the court would not hesitate to sentence defendant to death.

At the time the People made a motion to introduce the transcript of the plea proceeding into evidence the court inquired of defense counsel, who expressly stated that there was no objection. It is urged that the failure to object to the reading at the sentencing hearing precludes our consideration of this claim.

In *People v. Carlson* (1980), 79 Ill. 2d 564, this court considered whether alleged errors not objected to by defendant at trial were waived. After examining the waiver doctrine, and our Rule 615(a) (73 Ill. 2d R. 615(a)), which embodies the exception to the waiver rule, the court adhered to the rule that even in the absence of objection at

trial, a court of review will grant relief if the trial error is so prejudicial that real justice has been denied or the verdict of the jury resulted from such error. (See *People v. Carlson* (1980), 79 Ill. 2d 564, 576-77; *People v. Wright* (1974), 56 Ill. 2d 523, 533-34; *People v. Manzella* (1973), 56 Ill. 2d 187, 200.) The same rule applies whether the alleged errors occurred at trial or at sentencing. We will therefore examine the content of the transcript, as well as the other alleged sentencing errors, to determine whether any error deprived defendant of the fundamental right to a fair hearing.

In addressing defendant the court remarked, "if certain factors are present, you could be sentenced to death, \*\*\*. Did he [defendant's defense attorney] tell you that if the factors which are necessary and which are present and which I will read to you are present, I wouldn't hesitate to sentence you to death." He later went on to say, "I have to take into consideration our society, which has been neglected far too long by crimes of violence. And from what the facts appear to be here, these are senseless killings."

A judicial opinion should not influence the jury, either directly or indirectly. (*People v. Finn* (1959), 17 Ill. 2d 614, 617; *People v. Coli* (1954), 2 Ill. 2d 186, 189; *Marzen v. People* (1898), 173 Ill. 43, 57-59.) We note that at the conclusion of the first phase of sentencing the court instructed the jury: "Neither by these instructions nor by any ruling or remark which I have made do I mean to indicate any opinion as to the facts or as to what your verdict should be." Furthermore, when the court's remarks are read in the context of the entire plea proceeding, it becomes apparent that the court attempted to firmly impress upon defendant the grim fact that if he pleaded guilty to three murders, and if he chose to be sentenced by the court, and if the People proved beyond a reasonable doubt any statutory factor in aggravation, the court would not hesitate to sentence defendant to death. The court was required to in-

form defendant of such matters at the time of accepting his plea, and to determine that defendant understood this information. (73 Ill. 2d R. 402.) The veniremen were addressed, without challenge, along the same lines, in that each was questioned as to any hesitancy to abide by the death penalty statute, even if it meant the imposition of the death penalty if the aggravating factors were proved. We are not persuaded that defendant was prejudiced as the result of the transcript having been read to the jury at the sentencing hearing.

It is alleged that certain comments made by the court to the veniremen during *voir dire* examination were misstatements of law and that the court's conduct expressed a sarcastic attitude toward defendant. The record shows that, prior to questioning each panel of veniremen, the court attempted to familiarize the panel with the purpose and order of the bifurcated sentencing procedure. It is argued that the court's introductory remarks concerning the aggravation and mitigation phase of the hearing are considered objectionable for the same reason that section 9—1(g) is challenged on appeal; that the court implied that defendant must disprove the aggravating factors to escape the death penalty. We have examined the challenged passages and conclude that the court sufficiently informed the veniremen of the procedure under section 9—1(g). We find no merit in the contention that the court misstated the law in this regard.

It is further urged that another of the court's comments during *voir dire* compounded the prejudicial effect of an inappropriate jury instruction given at the conclusion of the hearing. A standard and unobjected-to general instruction included the sentence, "Your agreement upon a verdict must be unanimous." At one point during *voir dire,* the court advised a prospective juror, "you go out and determine whether or not this evidence has taken away the factors, mitigated the factors so that you might

say no, we don't want to vote for the death penalty. Now, that has to be a unanimous verdict in this case." It is urged that the instruction and comment created a presumption in favor of the imposition of the death sentence. The record shows, however, that the jury was instructed that it would receive, and that the jury did receive, two forms of verdict. One form stated that the jury was unable to unanimously conclude that the death penalty was warranted, and another stated that the jury unanimously concluded that there were no sufficiently mitigating factors to preclude the imposition of the death sentence. The jury was instructed that it was entitled to determine which verdict form was warranted. In view of the comments made by counsel during the proceedings, the proper instructions given by the court, and the verdict forms, it is clear that any confusion caused by the inappropriate instruction and the ambiguous, isolated comment by the court was inconsequential. There is no question whether the jurors were made aware of the right to arrive at a verdict of their choice, and the record presents no reason to conclude that defendant was prejudiced by court pronouncements of law.

It is also claimed that during *voir dire* the court improperly expressed personal knowledge of an essential element not yet proved and improperly implied that the determination of this critical question was nothing more than a formality. A prospective juror asked the court, "Why don't you know if he [the defendant] is 18?" The court responded that "I do know whether he is 18 or not, but the legislature said we have to do it all over again. *** This is something that was given to us by the legislature, and I have to proceed according to law. So that—well, that is what the defendant wants, and that is what he gets." Although no objection was made at the time the court's comment was made, the venireman was later challenged for cause by defense counsel. The record shows that the age element was satisfied through defendant's own admission of his age.

The court's comment could not possibly have affected the finding of age, and we are not persuaded that this statement communicated a negative attitude toward defendant. In another comment made by the court at the conclusion of the first stage of the bifurcated hearing the court directed court personnel to "Get instructions for this stage of the game." This comment, like the reference to the legislative decision above, may be criticized as showing discontent with legislative imposition of time-consuming procedures, but it does not indicate an opinion as to what penalty should be imposed against defendant.

Finally, we consider whether, as contended by defendant, the closing argument of the State's Attorney denied defendant his right to a fair sentencing hearing. Although there was no contention that defendant was in any way involved in the crime of rape, the State's Attorney in closing argument made several references to the threat posed by the crime of rape. First, in arguing the harm caused by defendant's acts of violence the State's Attorney alluded to the amount of liberty lost by society in general as a consequence of criminal activity and then mentioned the inability of a man to go to work in the morning in East St. Louis without being gunned down, and the inability of a woman to deliver mail in broad daylight in East St. Louis without being afraid that she is going to be raped and shot, obviously alluding to the victims of the April 30 shootings. At this point the court sustained an objection made by defense counsel and instructed the jury to disregard any reference to rape. Next, in arguing the need for severe penalties for those who commit violent crimes, the State's Attorney twice mentioned the crime of rape. The initial reference to rape was clearly objectionable, but the court's ruling on the objection and the court's instruction to disregard any reference to rape substantially corrected this error. (See *People v. Lion* (1957), 10 Ill. 2d 208, 216.) The later two references to rape were not directed at defendant, and no ob-

jection was made to these references during argument. In view of the earlier instruction to disregard all references to rape we are of the opinion that the jury was not misled thereby. We are not persuaded that defendant, by these comments, was deprived of a fair hearing. See *People v. Smothers* (1973), 55 Ill. 2d 172, 176.

At another point in closing argument the State's Attorney, apparently in an attempt to discredit defense counsel's argument in favor of a natural life sentence, presented the following rhetorical question to the jury, "How about the guards in that institution, and the inmates in that institution, are you so sure that you can preserve him from committing crime again by doing anything other than what he deserves, the death penalty?" We cannot say that this question regarding the safety of the hypothetical guard and inmates, not objected to at sentencing, was improper under these circumstances. After examining the State's Attorney's closing argument we find no reason to conclude that any comment made was so inflammatory as to deny defendant his right to a fair hearing.

We find no reversible error, and the sentences imposed for the murders of Samuel Nersesian and Debra Brown are affirmed. The sentence imposed for the murder of Richard Stoltz must, however, be vacated and the cause remanded to the circuit court of St. Clair County for the imposition of a sentence other than death. In *Enmund v. Florida* (1982), 458 U.S. 782, 73 L. Ed. 2d 1140, 102 S. Ct. 3368, the Supreme Court held that the defendant could not be put to death for two killings that he did not commit and had no intention of committing or causing. With respect to the death of Richard Stoltz there is nothing in the record that shows that defendant killed, attempted to kill, or intended to kill the victim, and the decision in *Enmund* requires that the death sentence be vacated. The cause as to the Stoltz murder is therefore severed and remanded to the circuit court of St. Clair County for the imposition of a

sentence other than death.

As to the judgment pertaining to the other two murders, the clerk of this court is directed to enter an order fixing Wednesday, May 18, 1983, as the date on which the sentence of death entered in the circuit court shall be executed at the Illinois State Penitentiary at Joliet. A certified copy of this order shall be furnished by the clerk of this court to the Director of Corrections and the wardens of the Illinois State Penitentiary at Menard and Joliet.

*Affirmed in part and vacated in part and remanded in part, with directions.*

JUSTICE SIMON, concurring in part and dissenting in part:

I do not agree that the defendant was given a fair sentencing hearing by a jury free from undue influence by the trial judge. A transcript of the proceedings in which Jones entered his guilty plea was read to the sentencing jury as a part of the evidence. The jury heard that the trial judge told Jones when the guilty plea was received "if certain factors are present, you could be sentenced to death ***. Did he [defendant's attorney] tell you that if the factors which are necessary and which are present and which I will read to you are present, I wouldn't hesitate to sentence you to death." Also read to the jury was the trial judge's later statement, "I have to take into consideration our society, which has been neglected for too long by crimes of violence. And from what the facts appear to be here, these are senseless killings."

What the trial judge meant by these statements is not clear. When he spoke of the factors "which are present" was it simply a slip of the tongue? Did he mean to say that if certain necessary factors which he would read to the defendant were present, he would sentence the defendant to death, or was he actually expressing his opinion that the factors were present? When he said he would not hesitate

to sentence the defendant to death did he intend to indicate that he believed such a sentence was appropriate in this case or was he merely expressing his willingness to follow the law which he believed gave him no discretion? When he said the killings were senseless did he mean they were more deserving of the death penalty than other triple murders, or that all murders were senseless in his eyes?

The risk that the jurors interpreted the trial judge's words to mean that he thought the death sentence was appropriate for Jones is too great. I believe that, in spite of the cautionary instruction given by the judge at the close of trial telling the jurors that nothing he said should be construed as expressing his opinion, some of the jurors may well have interpreted his comments as partisan.

The majority agrees that an expression of opinion by a judge must not be allowed to influence a jury. (See *People v. Finn* (1959), 17 Ill. 2d 614, 617; *People v. Coli* (1954), 2 Ill. 2d 186, 189; *Marzen v. People* (1898), 173 Ill. 43, 57-59.) A judge at a jury trial is not merely a moderator. The jury looks to him for guidance and wisdom. They depend upon his knowledge of the law and experience. As such, they are apt to be impressed by his every word. (*Bollenbach v. United States* (1946), 326 U.S. 607, 90 L. Ed. 350, 66 S. Ct. 402.) In this case the manner in which the jurors might have construed the trial judge's remarks cast him in the role of an additional prosecutor. (See *Wong Yang Sung v. McGrath* (1950), 339 U. S. 33, 94 L. Ed. 616, 70 S. Ct. 445, *modified on other grounds* (1950), 339 U.S. 908, 94 L. Ed. 1336, 70 S. Ct. 564; *Ruiz v. Delgado* (1st Cir. 1966), 359 F.2d 718.) I believe it was a serious error to allow the jury to hear the judge's remarks quoted above.

I also believe, even from the cold record, that the jury could have gained the impression that the trial judge was impatient with the defendant and therefore become prejudiced against the defendant himself for delaying the disposition of the case. I refer here to the trial judge's re-

marks, set forth in the majority opinion, when a juror asked the judge why he did not know if the defendant was 18 and also the court's direction to "get instructions for this stage of the game." Both of these comments are set forth in the court's opinion. Both remarks could have left the jury with the impression that the defendant was taking positions that caused the State to introduce matters over which there should have been no controversy and thus might have resulted in the jury being biased against the defendant.

I am also concerned about this court's failure to deal adequately with the defendant's argument that some members of the jury might have understood the judge to say that the burden of proof is on the defendant to prove that mitigating factors exist. The judge advised prospective jurors, "you go out and determine whether or not this evidence has taken away the factors, mitigated the factors so that you might say no, we don't want to vote for the death penalty." The defendant contends the jurors may have interpreted this to mean that the burden was on him. The majority points out that at other stages in the proceeding, it was made clear that a unanimous verdict must be reached before a death penalty can be imposed, and thus no harm occurred. The issue here, however, is not how many persons must agree, but what they agree to. Must the jury unanimously agree that beyond a reasonable doubt no sufficient mitigating factor exists, or that more likely than not no sufficient mitigating factor exists or that the defendant has failed to show that such mitigating factors exist? The jury does not know and neither do I. Unanimity, however, has nothing to do with the question.

For the above reasons I would vacate the defendant's sentence of death and remand for a new sentencing hearing.